FILED
2026 Sep-28 AM 08:24
U.S. DISTRICT COURT
N.D. OF ALABAMA

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**NORTHEASTERN DIVISION**

| | | |
|---|---|---|
| **DENISE MARY PRITCHARD, *for the use and benefit of* United States of America,** | } | |
| **Plaintiff,** | } | |
| **v.** | } | **Case No.: 5:14-cv-01452-MHH** |
| **ROCKWELL COLLINS SIMULATION AND TRAINING SOLUTIONS LLC,** | } | |
| **Defendant.** | } | |

**MEMORANDUM OPINION**

This is a False Claims Act case. The relator, Denise Pritchard, is suing Rockwell Collins Simulation and Training Solutions LLC for allegedly procuring sole-source contracts by deceiving the U.S. Army as to the Army's possession of and rights in intellectual property associated with Transportable Blackhawk Operational Simulators or TBOS. (Doc. 80).[1] The Court ordered staged summary judgment proceedings. (Docs. 149, 152, 158). Rockwell STS has moved for judgment in its favor, (Doc. 161), based on the Court's first summary judgment question:

[1] The parties have provided a joint glossary of technical terms and acronyms that appear throughout the record. (Doc. 156).

> Based on the evidence developed during Phase I discovery, can the Court find as a matter of law that the Army possessed all of the TBOS-related intellectual property the Army needed to solicit bids for the production of TBOS?

(Doc. 158). Rockwell STS argues that the Army did not possess the necessary intellectual property; Ms. Pritchard argues that the Army did possess the necessary intellectual property.

To resolve Rockwell STS's motion, the Court first discusses the standard of review that governs Rule 56 motions. Then, consistent with that standard, the Court summarizes the summary judgment evidence, presenting the evidence in the light most favorable to Ms. Pritchard, the non-movant. Finally, the Court analyzes the evidence under the legal standards applicable to this question to determine whether there are disputed questions of material fact for a jury to resolve.

***

Rule 56 of the Federal Rules of Civil Procedure governs motions for summary judgment. Rule 56 provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). To demonstrate that there is a genuine dispute as to a material fact that precludes summary judgment, a party opposing a motion for summary judgment must cite "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for

purposes of the motion only), admissions, interrogatory answers, or other materials." FED. R. CIV. P. 56(c)(1)(A). "The court need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3). When considering a summary judgment motion, a district court must view the evidence in the record in the light most favorable to the non-moving party. *Thai Meditation Ass'n of Ala., Inc. v. City of Mobile*, 83 F.4th 922, 926 (11th Cir. 2023). Because Rockwell STS moved for summary judgment, in this opinion, the Court presents the evidence in the light most favorable to Ms. Pritchard.

***

TBOS are helicopter flight simulators used to train military pilots on the latest helicopter configurations. (Doc. 134-6, pp. 1–2; Doc. 134-142, pp. 23, 43–44, 50–51, 63, 78–80, 102–03). Flight simulators existed before the TBOS, but the TBOS design is innovative because TBOS are compact and transportable, allowing them to be deployed on or near battlefields. (Doc. 134-142, pp. 21–24, 26–29, 63–64, 69–71). William Nikonchuk, the government's initial lead for the TBOS project, first conceived of the TBOS in late 2002 or early 2003. (Doc. 134-142, pp. 21–26).

The TBOS project involved multiple phases and contracts. The following table identifies them:

| Contract # | Nickname | Devices | Type | Approximate Dates | Contractor |
|---|---|---|---|---|---|
| DAAH01-02-R190 | JVYS contract | D1 | Development / Cost-plus | 2003 to 2007 | Joint Venture Yulista-Science and Engineering Services, Inc. (prime contractor); Rockwell STS (subcontractor) |
| DAAH23-03-D-0015 | CTES contract | D2–D4 | Development / cost-plus | 2007 to 2008 | Rockwell Collins, Inc. (prime contractor); Rockwell STS (subcontractor) |
| W58RGZ-08-C-0257 | TBOS production contract | D5–D9 | Production / firm-fixed price | September 2008 to September 2010 | Rockwell STS |
| W58RGZ-10-C-0163 | bridge contract | D10–D14 | Production / firm-fixed price | September 2010 through 2015 (definitized September 2011) | Rockwell STS |
| W58RGZ-13-R-0262 (solicitation number; ultimately contract was not awarded) | '262 solicitation | D15+ | Production / firm-fixed price | To begin in 2015 | Rockwell STS |

*See, e.g.*, (Doc. 156, pp. 1–2) (list of all contracts in parties' joint glossary); (Doc. 134-6, pp. 2–3) (history of prior contracts in 2011 TBOS acquisition plan); (Doc.

134-115) (JVYS subcontract with NLX Corporation); (Doc. 162-01) (statement of work and line item numbers for JVYS subcontract with NLX Corporation); (Doc. 134-110, pp. 32, 48–50) (Glen Krogh, Rockwell STS's director of contracting, explaining that Rockwell Collins, Inc. took over NLX and renamed it Rockwell STS, and also explaining the JVYS and CTES contracts); (Doc. 162-03) (CTES contract); (Doc. 134-125) (undefinitized TBOS production contract); (Doc. 142-21) (cancellation of '262 solicitation) (Doc. 134-142, pp. 88–90, 131) (Mr. Nikonchuk's explanation of the different contracts).

The first two contracts, the JVYS and CTES contracts, were research and development contracts geared toward production of TBOS prototypes. Like most research and development contracts, the Army awarded the contracts on a cost-plus basis. (Doc. 134-142, pp. 88–90, 131; Doc. 134-110, pp. 48–50). In cost-plus contracts, the government assumes the risk of research and development by paying all costs plus a fee, typically a flat fee. *See generally* 2 JOHN C. MCBRIDE, GOVERNMENT CONTRACTS: LAW, ADMINISTRATION, & PROCEDURE §§ 19.60–.90 (discussing cost-based government contracts).

Later contracts were production contracts on a firm-fixed price payment model. (Doc. 134-6, pp. 2–3). Production contracts generate developed and documented devices, though there may be minor adjustments to the design. (Doc. 131-142, pp. 131–32, 263; Doc. 134-110, pp. 105–06). In a firm-fixed price

payment model, the government pays the contractor a fixed fee regardless of costs, which incentivizes the contractor to reduce costs where possible while meeting the contract requirements. *See generally* 2 JOHN C. MCBRIDE, GOVERNMENT CONTRACTS: LAW, ADMINISTRATION, & PROCEDURE §§ 19.20–.50 (discussing firm-fixed price government contracts).

Most government contracts are awarded through a competitive bid process. *See generally* 1B JOHN C. MCBRIDE, GOVERNMENT CONTRACTS: LAW, ADMINISTRATION, & PROCEDURE §§ 9.10–10.260 (discussing processes for competing out government contracts). The Army intended to solicit competitive bids for TBOS production after the development phase was complete, and Army personnel communicated as much to Rockwell STS personnel. (Doc. 134-142, pp. 77, 84–85, 107). The operative documents for the JVYS and CTES contracts state that the production contracts were in anticipation of and preparation for competitive procurement of TBOS. *See, e.g.*, (Doc. 162-4, p. 8) (stating in CTES contract Statement of Work that "[t]his effort is to take the available documentation, specification, drawings, and plans generated from the evolutionary T-BOS, and build a T-BOS to that documentation. In the process, a technical design package would be validated to allow for the competitive procurement of future T-BOS devices."). In support of this goal, the development contracts stated that the software used on the TBOS should be nonproprietary. *See, e.g.*, (Doc. 162-1, p. 7, ¶ 3.3)

(stating in JVYS contract Statement of Work that "[a]ll software reused and/or developed for the T-BOS Phase IIC system shall be non-proprietary. All technical data or computer software generated by the T-BOS Phase IIC Contractor and paid for under this contract shall be delivered to the Government with unlimited rights"); (Doc. 162-4, p. 11, ¶ 3.4) (stating in CTES contract Statement of Work that "[a]ll software reused and/or developed for T-BOS Device #2 shall adhere to the same non-proprietary restrictions agreed to for Device #1").

The TBOS project was built on technology the government owned or had rights in. *See, e.g.*, (Doc. 134-142, pp. 25–34) (discussing how the TBOS program was supposed to leverage existing software from the lift simulation modernization program -- LSMP -- and advanced black hawk flight simulation -- ABHFS -- so the government "w[asn't] paying for the same product twice"); (Doc. 162-1, p. 7, ¶ 3.3) ("The T-BOS Phase IIC Contractor's software design shall maximize reuse of the base T-BOS UH-60L simulation software baseline."); (Doc. 162-22, p. 11 (statement by Christopher Gloe, Rockwell STS's TBOS program manager, that "[a]nything that was reused from the LSMP or ABHFS baseline would not have been charged to [the JVYS] contract"). At the beginning of the JVYS contract, the government gave the information in its possession to JVYS as government-furnished information, and JVYS provided the information to Rockwell STS. (*See* Doc. 162-1, pp. 7, 15; Doc. 134-115, p. 21).

During and at the end of each TBOS contract, the contractor or subcontractors submitted their work product to the government. The government then provided that information, including source code and technical drawing packages, as government-furnished information for the next task or project. (*See, e.g.*, Doc. 134-169, p. 57, tp. 56; Doc. 162-13, p. 6; Doc. 162-15, p. 17). Rockwell STS transmitted information to the government through a variety of means, including through hand-delivery of disks or hard drives of data and through an "integrated data environment" that provided open access to files as Rockwell STS worked on them. (*See, e.g.*, Doc. 134-142, pp. 36–40; Doc. 134-169, pp. 57–63, tpp. 56–62; Doc. 134-133; Doc. 162-4, pp. 13–14, ¶ 3.6; Doc. 162-1, pp. 8–9, ¶ 3.6; Doc. 134-68, pp. 7–9).

The contracts identified items that Rockwell STS was to provide to the government. Regarding the contents of the integrated data environment, the JVYS contract states:

> The T-BOS Contractor shall establish, maintain, and manage an interactive, online, protected, and access controlled Integrated Data Environment (IDE). The IDE shall allow IPT members to contribute their ideas, comments and suggestions, as well as exchange program information and collaborate in a distributed environment. The T-BOS Contractor shall include softeware applications and data base services for the generation, integration, storage, indexing, distribution, simultaneous on-line sharing of digital data among all government and contractor team members, and delivery of technical data products with associated contractors, subcontractors, and government organizations. Specifically, integrated automated databases are required which shall allow technical data sharing at the database level, rather than at the physical file level, with multiple formats of the same data from a common, configuration-controlled source available to different users.

The IDE shall provide program personnel complete visibility into the system at every stage of development, regardless of data location. The T-BOS Contractor shall ensure that everyone associated with this project has access to the IDE contents. The T-BOS Contractor shall deliver the IDE contents to the government, upon program completion. The following information shall be available on this site:

a. Program Information – Contains general information such as contract information, organization charts, points of contact lists, and general policies

b. Discussion Database – Allows communications among all users of Internet Project Sharing System. Items posted can be responded to by anyone with access

c. Document Development Folders – Analogous to Software Development Folders, but for deliverable documentation such as technical publications

d. Drawing Library – Analogous to software development folders, but for hardware items. Captures and tracks design and drawings for electrical and mechanical assemblies, and cables

e. Formal Action Items – Formal mechanism for tracking program Action Items (Both customer and Prime Contractor)

f. Program Data Library – Maintains and tracks whereabouts of program data library. Tracks COTS and vendor software documentation, design criteria data, and technical publications

g. Project Technical Information – Catch all database for maintaining miscellaneous Technical Data. Items such as Trade Studies, Technical Reports, etc. are captured here

h. Risk Management – Mechanism for administering a risk management program. Tracks program and technical risks as well as mitigation plans

i. CDRLs – Contains CDRL delivery schedule, history of already delivered CDRLs, snapshot of CDRLs being worked on, and copies of delivered CDRLs

> j. Software Development Folders – Captures and tracks software development effort for all software modules. Contains requirements, test plans and procedures, design information, source code, and test results.
>
> k. Reviews, Meetings and Conferences - Contains complete package related to formal meetings. includes agenda, minutes, presentation material, list of attendees, and links to subsequent action items

(Doc. 162-1, pp. 8–9, ¶ 3.6). Elaborating on the required work product, the JVYS contract states:

> 3.8.1 Product Definition Data (WBS 7042.04.02.07)
>
> During the systems engineering and design, and in accordance with MIL-DTL-31000, the TBOS Contractor shall develop, produce, and maintain product definition data (PDD) that accurately depicts the final product. The PDD is the technical description of items adequate for supporting an acquisition strategy, production, engineering and logistics support. The PDD shall disclose complete design logistics, manufacturing requirements, and the means of measuring compliance with the requirements. Piece part information (drawings, computer aided design files and meta data) and associated lists shall provide the necessary design, engineering, manufacturing, and quality assurance requirements information necessary to enable the procurement or manufacture of an interchangeable item that duplicates the physical and performance characteristics of the original product, without additional design engineering effort or recourse to the original design activity. The TBOS Contractor shall produce and maintain documentation for all electrical assemblies and subassemblies in such a manner to ensure their functional integration without recourse to special test equipment.

(Doc. 162-1, p. 9, ¶ 3.8.1). The JVYS contract includes line items for a software product specification, including source code, and product drawings and associated lists. (Doc. 162-01, p. 14; Doc. 134-33, pp. 3–4).

The CTES contract contains similar requirements. It states that the contractor had to maintain an integrated data environment that was "the same as currently in use for T-BOS Device #1," although the list following the provision dropped the "software development folders" subparagraph. (Doc. 162-4, pp. 13–14, ¶ 3.6). Mr. Nikonchuk stated that the omission was an oversight. (Doc. 134-142, pp. 189–90). A modification to the contract added line items for product drawings and associated lists and program-unique specification documents. (Doc. 162-05, p. 22). Ms. Pritchard has not cited a specific line-item in the CTES contract that explicitly required delivery of source code, but an internal Rockwell STS email chain stated that Rockwell STS had "validated that contractually, up to Device 8, source code was a requirement." (Doc. 134-141).

Rockwell STS conveyed source code and other technical data to the government in 2007, during the CTES contract, and possibly as late as 2010, during the TBOS production and/or bridge contracts. (*See, e.g.*, Doc. 134-142, pp. 36–40; Doc. 134-169, pp. 57–63, tpp. 56–62; Doc. 134-133; Doc. 162-4, pp. 13–14, ¶ 3.6; Doc. 142-21; Doc. 138-68, pp. 7–8; Doc. 134-117, pp. 10–11; Doc. 162-24, p. 10). Mr. Gloe said in a March 2015 internal email chain that Rockwell STS would "never be able to nail down th[e] details" of "when and where . . . source code might have been loaded on devices" delivered to the government. (Doc. 134-78, p. 1). The source code Rockwell STS provided in 2007 did not have restrictive markings.

(Doc. 142-21) ("The Government has since determined that it is in possession of unmarked TBOS source code. This source code was delivered, without restrictive markings, to the Government as part of a TBOS device in February 2007.").

Per Mr. Nikonchuk, sometime between 2008 and 2010, the government obtained a complete technical data package ready for competition. In February 2008, the government had technical data packages, but the packages were not ready for competition because the packages were being audited. (Doc. 134-142, pp. 34–35, 45–46, 101, 113–23, 125–26, 131, 150–51, 208–09; Doc. 134-169, pp. 15–16, 130–32, tpp. 14–15, 129–31; Doc. 162-24, p. 10). To keep the TBOS program on schedule, the government awarded Rockwell STS a sole-source procurement contract. *See* (Doc. 134-145) ("justification and approval" for non-competitive award submitted on February 14, 2008 and approved on February 20, 2008).[2] Sometime between February 2008 and 2010, the audits were completed, and a complete technical data package was ready for competition. (Doc. 134-142, pp. 121–22, 126, 151).

[2] "Agencies are permitted to purchase supplies or services from a single source without conducting full and open competition when those supplies or services are available only from a single source and no other type of supply or service will satisfy the government's needs. Contracts awarded under this authority must be supported by written justifications and approvals (J&A). . . . If an article is proprietary and distributed in commerce by only one manufacturer, then it is a sole-source situation." 1B JOHN C. MCBRIDE, GOVERNMENT CONTRACTS: LAW, ADMINISTRATION, & PROCEDURE § 9.50[4] (first citing 10 U.S.C. § 2304(c)(1); then citing 41 U.S.C. § 3304; then citing 48 C.F.R. § 6.302-1(d); and then citing *Secretary of the Navy*, A-19811, 7 Comp. Gen. 282 (1927)).

In 2008, roughly concurrent with the start of the sole source TBOS production contract, Mr. Gloe became Rockwell STS's TBOS program manager. (Doc. 134-32, pp. 14, 121, tpp. 13, 120; Doc. 134-142, p. 156–57). Mr. Nikonchuk had a great working relationship with Mr. Gloe's predecessor, Michael Durant, who was "very forthright" and team-oriented. (Doc. 134-142, pp. 55–57). When Mr. Gloe took over, Mr. Nikonchuk noted that the Rockwell STS team became secretive and did not act as team players. (Doc. 134-142, pp. 56–58).[3]

Mr. Nikonchuk discovered Rockwell's Common Simulation Environment software on a TBOS in the summer of 2008 when Rockwell STS attempted to deliver the TBOS. (Doc. 134-142, pp. 48–50, 99–100, 124, 156, 253–55). Mr. Nikonchuk had understood that Rockwell STS would be using CSE as a software development tool to develop source code, but he did not believe CSE was necessary to run the source code, and Rockwell STS and Rockwell Collins, Inc. did not inform him that CSE would remain on the devices when Rockwell STS delivered the TBOS to the Army. (Doc. 134-142, pp. 50–51, 60, 99–100, 155–56, 254–55; Doc. 134-169, pp. 174–75, 180–84, 212–16, tpp. 173–74, 179–83, 211–15). Rockwell STS asserted that CSE was proprietary. (Doc. 134-142, pp. 48–49). Mr. Nikonchuk, acting for

[3] Rockwell STS's scienter will be the subject of later stages of briefing, so the Court has not performed a full accounting of the evidence on that topic here. Statements about Rockwell STS's motives are subject to revision later.

the government, did not want to accept the TBOS with the allegedly proprietary CSE on it, but because of the urgent military need for the TBOS, Mr. Nikonchuk had no time to debate the issue with Rockwell STS and agreed to accept the TBOS with the notation that CSE was proprietary, modifying the contract accordingly. (Doc. 134-142, pp. 48–51, 124, 165–66).[4]

Starting with the TBOS production contract, Rockwell STS and the Army "tailored out" source code from the contract items to be delivered. (Doc. 134-9, p. 40; Doc. 134-8, p. 1; Doc. 134-196, p. 32). Still, Rockwell STS continued to deliver software which may have included source code. Hand delivery receipts from 2008 and 2009 noted in the description that the software delivered "[d]oes not include RC Proprietary CSE," but not all hand receipts had this notation. (Doc. 134-133; Doc. 134-132). Rockwell STS has not cited evidence showing that software or source code apart from CSE was marked as proprietary. A document from 2012 negotiations between Rockwell and the government shows that Rockwell attempted to assert it provided other TBOS items with only restricted rights; the government challenged those claims. (Doc. 134-165; Doc. 134-142, p. 247). In the same document, the government asked for substantiation for Rockwell's assertion that

[4] At one point, some drawings for the first and second devices were marked as Rockwell proprietary. The government told Rockwell Collins, Inc. or Rockwell STS to remove the proprietary markings because the government had paid for the drawings, and the issue was apparently resolved without debate; Mr. Nikonchuk characterized it as an "oversight" that needed "clean-up." (Doc. 134-142, p. 46).

CSE was developed exclusively at private expense. (Doc. 134-165, pp. 2–3; *see also* Doc. 134-142, p. 248). Rockwell STS has not cited evidence that demonstrates CSE was developed exclusively at private expense. Rockwell STS delivered updated drawings and other forms of technical data during the TBOS production contract. (*See, e.g.*, Doc. 134-117, pp. 10–11; Doc. 134-68, pp. 7–11; Doc. 162-24, p. 10).

In late June 2010, the government publicly issued a "request for information" "to identify potential sources and alternate/proposed design approaches" for the TBOS program. (Doc. 134-2, pp. 2–3).[5] Mr. Nikonchuk explained that part of "the point of competition was for anybody to include Rockwell, to compete and build a better device with better code" because the existing code was unstable and had become increasingly unstable over time. (Doc. 136-169, pp. 137, 155–65, tpp. 136, 154–64; *see also* Doc. 134-142, pp. 36–44, 241–43, 258–63). A TBOS "Source Selection Plan" from 2011 stated that prospective contractors "shall provide a detailed discussion and plans for improving the Technical Architecture of T-BOS over its current capabilities." (Doc. 134-192, pp. 35, 42–44). The TBOS source selection plan stated that "Prospective bidders will have access to the current T-BOS Technical Data Package (TDP) (and Executable [Software]), but will not be required

[5] The exact timeline of and reasons for events in 2010 and beyond have not been fully briefed because the particulars are largely outside the scope of the first summary judgment question. Accordingly, the following summary of the facts is subject to change upon further briefing. The Court provides this summary to indicate when the government intended to compete out the TBOS contract and to contextualize the evidence cited by Rockwell STS.

to use the Government Furnished Information (GFI)," i.e., the current TDP and software. (Doc. 134-192, p. 5).

Based on the responses to the June 2010 request for information, the government identified one or more small businesses that were interested in and qualified to receive a TBOS contract. (Doc. 134-1, pp. 103–04, 168–72). By October 2010, the government had decided to limit the competition to small businesses in what is known as a "small business set-aside." (Doc. 134-1, pp. 168–72). The Rockwell entities would not be eligible for the prime contract in a small-business set-aside because they are large businesses. (Doc. 134-1, pp. 171–72).

On or around September 30, 2010, the government awarded another sole-source contract to Rockwell STS as a bridge contract "to mitigate development or delivery delays" while the small-business set-aside procurement was "being awarded." (Doc. 134-6, pp. 3, 11; *see also* Doc. 134-21, pp. 183–85; Doc. 142-6, p. 1, box 10B).[6] When the bridge contract was awarded to Rockwell STS in September 2010, it was an "undefinitized contract action." (Doc. 134-1, pp. 67–68). The government uses undefinitized contract actions "when the government has a need but does not have time to go through the actual contract process." (Doc. 134-1, p. 68). The contractor gives the government a not-to-exceed quote that caps the value

[6] In some circumstances, the government may pursue parallel procurement paths to make sure the government's needs are met while the government seeks new sources and gets contracts with those new sources underway. (Doc. 134-1, pp. 102–03).

of the services to be provided until the parties can agree on, or "definitize," the exact terms of the contract. (Doc. 134-1, p. 68–70); *see also* (Doc. 156, p. 17) (defining "NTE"); 2 JOHN C. MCBRIDE, GOVERNMENT CONTRACTS: LAW, ADMINISTRATION, & PROCEDURE § 19.160 (discussing undefinitized "letter contracts"). Contracts usually must be definitized within 180 days. (Doc. 134-1, pp. 69–70). "The maximum liability of the Government" in an undefinitized contract "shall be the estimated amount necessary to cover the contractor's requirements for funds before definitization[,] . . . not [to] exceed 50 percent of the estimated cost of the definitive contract unless approved in advance by the official that authorized the letter contract." 48 C.F.R. § 16.603-2. The bridge contract was not definitized until September 29, 2011. (Doc. 134-1, pp. 113–14; Doc. 142-6).

The government publicly announced the small business set-aside on June 20, 2011. (Doc. 134-2, pp. 10–11; *see also* Doc. 134-142, pp. 59, 246; Doc. 134-169, pp. 136–37, 140–41, 149, tpp. 135–36, 139–40, 148).

Subsequently, some government personnel became concerned that the government was missing pieces of up-to-date technical data, and the government contacted Rockwell STS to fill the gaps. On September 8, 2011, Army Contracting Officer LeChara Fletcher wrote to David Lawter, a contract manager for Rockwell STS, and requested a quote for delivery of a technical data package. (Doc. 134-

102).[7] On November 18, 2011, Mr. Lawter responded and said that Rockwell STS declined to provide a quote. (Doc. 134-103). On March 19, 2012, Army Contracting Officer Lana P. Decker wrote to Mr. Lawter and attempted to place a deferred order pursuant to Defense Federal Acquisition Regulation Supplement clause 252.227-7027 for source code and a level III technical data package. (Doc. 134-105). On March 27, 2012, Mr. Lawter wrote back, arguing that the regulation did not apply because "the software wasn't developed under the [TBOS production] contract," and the requirement for delivery of source code was tailored out of the contract. (Doc. 134-106).

On June 20, 2012, the government announced it was cancelling the small-business set-aside because "[i]t has been determined that the Government does not have a complete technical data package, inclusive of source code, that would allow the requirement to be procured competitively." (Doc. 134-2, p. 24). On July 22, 2013, the government announced that it would be awarding another sole-source contract to Rockwell STS, with solicitation number W58RGZ-13-R-0262. (Doc. 134-2, pp. 27–29).

[7] Mr. Nikonchuk acknowledged that when Ms. Fletcher emailed Rockwell STS in September 2011 to request an updated technical data package, the government did not have every single technical data package component Ms. Fletcher was requesting, but Mr. Nikonchuk disputes whether all of these components were necessary for competition. (Doc. 134-169, pp. 132–40, tpp. 131–139) (discussing Doc. 134-102).

In 2015, the government revisited Rockwell STS's assertion that the government "did not own a TBOS [technical data package], inclusive of source code, that was suitable for competition." (Doc. 142-29, p.1). On March 3, 2015, Ms. Fletcher wrote to Mr. Lawter and stated that "[t]he Government is now in possession of unmarked TBOS source code which was delivered to the Government on previous devices." (Doc. 142-29, p.1; *see also* Doc. 142-18, p. 3). Ms. Fletcher asked Rockwell STS to substantiate its contention that the TBOS were proprietary. On March 24, 2025, Mr. Krogh, Rockwell STS's director of contracts, responded and argued that "at no time was the entire source code package loaded on any device during development," and "either the Government [wa]s not fully informed as to the true functionality and utility of the pieces of source code it purport[ed] to possess, or it [wa]s in possession of source code that was improperly obtained." (Doc. 142-20, p. 5). On June 10, 2015, Ms. Fletcher rejected Rockwell STS's explanation and cancelled the '262 solicitation:

> This source code was delivered, without restrictive markings, to the Government as part of a TBOS device in February 2007. Pursuant to the Defense Federal Acquisition Supplement (DFARS) 227.7203-10, computer software delivered or otherwise provided under a contract without restrictive markings is presumed to have been delivered with unlimited rights for the Government, and may be released or disclosed without restriction. A contractor may request permission to have appropriate legends placed on unmarked computer software or computer software documentation at its expense; however, that request must be received by the

> contracting officer within six months following the furnishing or delivery of such software or documentation, or any extension of that time approved by the contracting officer. Rockwell Collins delivered the source code on a TBOS device but did not to request permission to have the appropriate markings placed on the delivered source code within the specified timeframe.
>
> ….The Government considers RC/STS's claim to proprietary ownership of the TBOS technical data package and source code, as stated in your letter dated 24 March 2015 to be unsupported.
>
> Based on the Government's recent, in-depth review of the TBOS device referenced above, the Government has rights to the technical data package, including the source code, suitable for competition and therefore the basis for the J&A is no longer valid and a sole source procurement cannot be supported. For this reason, Solicitation No. W58RGZ-13-R-0262 is cancelled.

(Doc. 142-21, pp. 1–2). The record does not indicate that Rockwell STS appealed the government's determination. Rockwell STS appears to have since stipulated that the government has rights in the data actually in its possession, although Rockwell STS did not specify what type of rights (e.g., unlimited or government purpose) it believes the government possesses. (Doc. 141, pp. 10–12).

***

The parties appear to agree that the Army needed both physical possession of copies of TBOS-related intellectual property and either unlimited or government purpose rights in that intellectual property to solicit bids for the production of TBOS. (Doc. 80, pp. 65–66, ¶ 145; Doc. 135, pp. 25–29). Among other evidence, Mr.

Nikonchuk's testimony and Ms. Fletcher's June 10, 2015 letter would allow a reasonable juror to find that Rockwell STS gave the government copies of the necessary intellectual property sometime between 2007 and 2010 and that the government had unlimited or government purpose rights in that property.

Rockwell STS argues that the government did not possess the necessary intellectual property because the government did not include line items in its contracts with Rockwell STS requiring delivery of the necessary intellectual property. Logically, a contractor could give the government something even if it was not contractually required to do so. Mr. Nikonchuk testified that Rockwell STS did just that. Ms. Fletcher's June 10, 2015 letter corroborates Mr. Nikonchuk's testimony—based on a 2007 delivery of a TBOS with source code that lacked restrictive markings, the government felt confident enough that it possessed the intellectual property necessary for competition that it cancelled the '262 solicitation for another sole-source award to Rockwell STS. Rockwell STS's internal communications reflect uncertainty about what the company might have included on the devices it delivered to the government. Some deposition testimony and documents from 2010 to 2012 show the government may have lost track of what it possessed, or there may have been miscommunication or disagreement among different government officials as to what the government possessed, but these pieces

of evidence create an issue of fact as to whether the government possessed necessary information during that timeframe.[8]

Rockwell STS argues that the Court should disregard Mr. Nikonchuk's testimony because "in his personal opinion, Mr. Nikonchuk disagreed with the Army professionals who were running the TBOS program after he left," he "conceded he is not an expert on the Federal Acquisition Regulations," and "[h]is views as an engineer cannot trump the testimony and statements of the Army's contracting officers." (Doc. 161, pp. 18–19). These are credibility arguments, which a court cannot resolve at summary judgment. *See, e.g.*, *Blanco v. Samuel*, 91 F.4th 1061, 1070 (11th Cir. 2024) (quoting *Miller v. Harget*, 458 F.3d 1251, 1256 (11th Cir. 2006)) ("[E]ven if a court 'believes the evidence presented by one side is of doubtful veracity, it is not proper to grant summary judgment on the basis of credibility choices.'"). Mr. Nikonchuk does not need to be an expert on the Federal Acquisition Regulations to testify about what was provided to him. And even if the Court were to disregard Mr. Nikonchuk's testimony, Rockwell STS has not explained why the Court should disregard Ms. Fletcher's 2015 letters; Rockwell STS does not mention those letters in its brief on the first question.

[8] Based on Ms. Pritchard's second amended complaint, (Doc. 80), the Court understands that Ms. Pritchard will be arguing in later stages of summary judgment briefing that Rockwell STS tricked the government into thinking it did not possess information or rights that Rockwell STS had provided to it, attempted to sabotage source code in the government's possession to support its contention that the code was proprietary, and possibly collaborated with someone in the government to get sole-source contracts awarded on false pretenses.

To the extent that Rockwell STS suggests that the government needed the most up-to-date version of the TBOS-related intellectual property, this is another issue of fact for the jury. Witnesses from both sides testified that the TBOS were basically fully developed by 2008 when the TBOS production contract started, subject to relatively minor adjustments. Accordingly, a reasonable juror could find that additional changes after 2007 or 2008 were relatively minor and within the scope of what a new contractor could handle in a new production contract, even if the government preferred to provide prospective competitors with the most up-to-date code and technical data package. A juror also could conclude, based on Mr. Nikonchuk's testimony and the source selection plan, that the government or prospective contractors did not need the most up-to-date code because the government hoped that a new contractor would rewrite the code to be more stable. A reasonable juror could thus find that the Army physically possessed copies of all of the TBOS-related intellectual property the Army needed to solicit bids for the production of TBOS.

In its brief, Rockwell STS has not clearly argued that the government lacked either government-purpose or unlimited rights to use the data that it possessed. Indeed, Rockwell STS appears to have stipulated that the government does have such rights. To the extent that Rockwell STS argues that the government did not have appropriate rights in the technical data package or source code because there

was no line item in the contracts requiring delivery of these items, or because Rockwell STS's conveyance does not meet the technical definition of delivery, *see* 3 JOHN C. MCBRIDE, GOVERNMENT CONTRACTS: LAW, ADMINISTRATION, & PROCEDURE § 26.10 (discussing definition of "delivery" in government contracts), the Court is not persuaded. Rockwell STS has not cited a case, statute, or regulation for the proposition that the government cannot use an item actually provided to it without restrictive markings. The regulation that Ms. Fletcher relied on in rejecting Rockwell STS's claims that its technology was proprietary applies to "[c]omputer software or computer software documentation delivered or otherwise provided under a contract without restrictive markings." 48 C.F.R. § 227.7203-10(c)(1) (2007). The unmarked data Rockwell STS provided to the government was, at a minimum, "otherwise provided" in the course of Rockwell STS fulfilling its contract, even if the contract did not explicitly list that data as a deliverable. To the extent the government did not already have rights in the data, it could thus claim those rights under 48 C.F.R. § 227.7203-10(c). *See* W. Jay DeVecchio, *Taking the Mystery out of Data Rights*, BRIEFING PAPERS, no. 18-8, July 2018, at 1, 1 (footnotes omitted) ("Integrated Product Teams (IPTs) may inadvertently establish access (electronically or otherwise) to in-process technical data or software, which may not be deliverables under the contract. This means that technologists and engineers at all levels, whether working for the Government or for a contractor, must understand

that if data or software will be delivered indirectly these ways, the data or software must be correctly marked with the exact limited rights or restricted rights legends specified in the clauses. Failing to mark can result in losing rights.”). A reasonable juror could thus find that the government had rights to use the data in its possession.[9]

***

Accordingly, the Court finds that there is a material issue of fact as to whether the Army possessed all of the TBOS-related intellectual property the Army needed to solicit bids for the production of TBOS. The Court thus denies Rockwell STS's first motion for summary judgment. (Doc. 161). In a separate order, the Court will set a telephone conference to discuss the next stage of summary judgment briefing.

**DONE** and **ORDERED** this September 28, 2026.

**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE

[9] Because Rockwell STS failed to protect proprietary rights it may have had originally, the Court need not address whether Rockwell STS had proprietary rights in the first place. Likewise, because the record contains evidence of actual delivery or conveyance, the Court need not resolve the parties' arguments as to what the contracts required Rockwell STS to deliver.